UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA SHEHEE, | ) | CASE NO. 1:18-CV-01074 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | REPORT& RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

Plaintiff Patricia Shehee ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1. In her complaint, filed on May 9, 2018, Plaintiff asserts that the administrative law judge ("ALJ") erred by: (1) discounting her allegations of pain and disability symptoms; and (2) finding that she could perform more than sedentary work and did not have limitations as to absenteeism and being off-task. *Id.* Defendant filed an answer on July 24, 2018. ECF Dkt. #11. Plaintiff filed her brief on the merits on August 23, 2018. ECF Dkt. #13. Defendant filed a response brief on November 6, 2018. ECF Dkt. #16. Plaintiff did not file a reply brief.

For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

1

ALJ's decision and DISMISS Plaintiff's case in its entirety with prejudice.

## I.     PROCEDURAL HISTORY

On November 5, 2015, Plaintiff protectively filed an application for SSI, alleging a disability onset date of October 9, 2011. ECF Dkt. #12 ("Tr.") at 157-167.[2] Her claim  was denied both initially and upon reconsideration. *Id.* at 86, 96. On June 7, 2016, Plaintiff filed a written request for a hearing before an ALJ. *Id.* at 101. Plaintiff appeared and testified at a hearing before an ALJ on October 16, 2017.  *Id.* at 11, 120, 147. Ted S. Macy, an impartial vocational expert ("VE"), also appeared at the hearing telephonically. *Id.* at 11, 26, 28. On November 30, 2017, the ALJ issued a decision denying Plaintiff's claim for SSI. *Id.* at 8-21. On April 5, 2018, the Appeals Council denied Plaintiff's request for review. *Id.* at 1. Accordingly, the decision issued by the ALJ on November 30, 2017 stands as the final decision.

Plaintiff filed the instant suit on May 9, 2018. ECF Dkt. #1. Defendant answered the complaint on July 24, 2018. ECF Dkt. #11. On August 23, 2018, Plaintiff filed a brief on the merits. ECF Dkt. #13. Defendant filed a response brief on November 6, 2018. ECF Dkt. #16. Plaintiff did not file a reply brief.

## II.     MEDICAL AND TESTIMONIAL EVIDENCE

### A.     Medical Evidence

Plaintiff alleged a disability onset date of October 9, 2011, but the earliest medical records on file date from February 12, 2015. Tr. at 11, 242. Plaintiff was diagnosed with hypertension

---

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed as a .PDF, rather than the page numbers assigned by the CM/ECF system.  When the Transcript was filed the .PDF included an index, with the indexed pages differentiated from the numerical pages.  Accordingly, the page number assigned in the .PDF mirrors the page number printed on each page of the Transcript, rather than the page number assigned when the Transcript was filed in the CM/ECF system.

("HTN") in her 30s and followed up with her former primary care provider ("PCP") at St. Lukes until 2011. *Id.* at 242. Plaintiff did not have a PCP and was not on any medications for 3 years until February 2015. *Id.* at 242, 245. On February 12, 2015, Plaintiff visited St. Vincent Charity Medical Center in Cleveland, OH to establish a new PCP. *Id.* at 242, 388. During this first visit in February 2015, the hospital reported that Plaintiff had a past medical history ("PMH") of HTN, hyperlipidemia, chronic obstructive pulmonary disease ("COPD") and was a chronic smoker who had quit one year prior. *Id.* at 242. Plaintiff's blood pressure ("BP") was elevated (diastolic of 139 and a systolic of 230, *id.* at 253) and she was rushed to the emergency department after she was given some oral medications to bring her BP level down. *Id.* at 242. She also complained of a frontal headache that started at the emergency department's office, as well as midsternal heaviness and sharp left lower rib chest pain on and off on moving in the bed. *Id.* Her headache improved, but her chest pain became worse with movements. *Id.* The hospital noted her blindness and mature cataract in her left eye and noted that her right eye had mild exophthalmos. *Id.* at 244; *see also id.* at 308. Plaintiff's high BP was treated with a Cardizem drip. *Id.* at 253. She also received an echocardiogram, which showed left ventricular hypertrophy and impaired diastolic filling presented with squeezing chest pain. *Id.* at 260.

On March 25, 2015, Plaintiff was admitted to the emergency department and was discharged on March 27, 2015. *Id.* In the morning of March 25, Plaintiff reported chest pain lasting for about 10 minutes and rated her pain a 10/10, but then in the afternoon it lowered to a 6/10. *Id.* Plaintiff also noticed some mild shortness of breath with minimal exertion. *Id.* The hospital found the following: the chest pain was non cardiac; unclear etiology; EKG was negative; cardiac enzymes were negative; and exercise stress test was negative. *Id.* Plaintiff's discharge medications consisted of

Pravastatin Sodium (Pravachol), Amlodipine Besylate (Norvasc), Lisinopril (Zestril), Hydrochlorothiazide (Oretic), Metformin HCl (Glucophage), and Aspirin EC (Aspirin Enteric Coated).

Plaintiff was referred to physical therapy, which she started on July 20, 2015 and ended on August 17, 2015. *Id.* at 300. Her functional goal was to be able to stand and walk without leaning on something for 15 minutes. *Id.* Upon discharge, she reported back pain but no lower extremity pain, and she was able to tolerate new stabilizing exercises. *Id.* at 300-304.

On October 26, 2015, Plaintiff visited the emergency department complaining of bilateral leg pain for the past hour. *Id.* at 286, 384. She believed the pain was caused by the Prevacid medication she was taking. *Id.* at 289. She denied having any trauma and told the doctor that she never had any problem with blood clots and is on no medications that would predispose her to have that. *Id.* She also stated that she did not have calf pain and the leg cramps ceased during her hospital visit. *Id.* Plaintiff was sent home after her triage and was prescribed Cyclobenzaprine HCl (Flexeril). *Id.* at 287, 291. She was also instructed to apply heat to her legs and restrict activity. *Id.* at 291.

On June 25, 2016, Plaintiff visited the emergency department of her PCP twice due to left hip and back pain. *Id.* at 371, 379, 381. First, she visited and was diagnosed with sciatica. X-rays of her left hip appeared unremarkable for bony abnormalities. *Id.* at 371. She was given Toradol and muscle relaxers, but she did not fill her muscle relaxer prescription by the time of her second visit that same day. She was subsequently discharged. Later that same day, Plaintiff called EMS after she experienced pain climbing her stairs, localized to her left paraspinal muscles. *Id.* The doctor noted that Plaintiff had prescriptions from previous visits for anti-inflammatories and muscle relaxers but found her to be "noncompliant on medications" and that she "[d]isplays some evidence of drug-

4

seeking behavior." *Id.* at 375.

On February 22, 2017, Plaintiff visited her PCP with complaints of sharp nonradiating substernal chest pain of sudden onset. *Id.* at 364. Her pain was aggravated with touching of her inferior aspect of her sternum and it has no relieving factors and is associated with lightheadedness. *Id.* She was told to take aspirin. *Id.* at 370.

On February 24, 2017, Plaintiff visited her PCP with complaints of chest pain suggestive of a musculoskeletal process. *Id.* at 360. She reported significant improvement in chest pain from 10/10 on admission to a 1/10 after receiving IV Toradol. *Id.*

On August 8, 2017, Plaintiff visited her PCP and complained of left dental pain. *Id.* at 352. The hospital found widespread dental decay. *Id.* at 353. She was prescribed Naprosyn and Amoxicillin. *Id.* at 354.

On August 18, 2017, Plaintiff visited her PCP, complaining of chest pain and mild shortness of breath, but she was not found to have any cardiac causes. *Id.* at 318, 323. The hospital ruled out acute coronary syndrome ("ACS") and her EKG did not reveal any new ST-T wave abnormalities and troponins X2 were negative. *Id.* at 323, 326. The hospital determined that Plaintiff's chest pain was likely musculoskeletal. *Id.* at 326. The hospital also noted that she had a PMH of diabetes mellitus ("DM") type II. *Id.* at 328. Plaintiff's list of medications at this time included Aspirin, Aspirin EC, Gabapentin (Neurontin), Gemfibrozil (Lopid), Glipizide (Glucotrol), Metformin HCl (Glucophage), and Naproxen. *Id.* at 329, 338.

The ALJ relied on four separate medical opinions to help him to determine Plaintiff's RFC. *Id.* at 18-19. The ALJ considered Plaintiff's treating providers. *Id.* at 18-19. Dr. Levy, M.D. completed a Functional Capacity Letter dated October 7, 2015 in which he noted Plaintiff's lumbar

back pain, his treatments from July 10, 2015, August 14, 2015, and October 2, 2015, and her prognosis that she should follow-up with a spine specialist. *Id.* at 19. The ALJ afforded Dr. Levy's opinion less than controlling weight because Dr. Levy provided no opinion regarding specific functional limitations. *Id.*

The ALJ also considered Plaintiff's other treating source, Dr. Louis, M.D., who completed a Medical Source Statement - Physical (MSS) on February 24, 2016. *Id.* Dr. Louis noted a treating relationship of one year and Plaintiff's diagnosis of blindness in her left eye with a stable prognosis; he noted no symptoms of pain, dizziness, or fatigue, and he noted that she does not use a cane or other assistive device while engaging in occasional standing or walking. *Id.* "Dr. Louis only indicated visual limitations of one degree DOC but no other exertional, postural, manipulative, or psychological limitations." *Id.* Additionally, the ALJ found that Dr. Louis "opined no limitations regarding interference with attention and concentration due to pain or other symptoms, work stress tolerance, and absenteeism." *Id.* The ALJ gave Dr. Louis's opinion less than controlling weight as well. *Id.*

The ALJ then afforded great weight to the State agency medical consultant at the reconsideration level, Dr. Hughes, M.D, finding that his opinion was consistent with the record as a whole. *Id.* at 18. Dr. Hughes opined that Plaintiff: (1) can lift and/or carry 20 pounds occasionally and 10 pounds frequently; (2) can stand and/or walk about six hours in an eight-hour workday; (3) can sit about six hours in an eight-hour workday; (4) can frequently climb ramps or stairs, never climb ladders, ropes, or scaffolds, and frequently balance, stoop, kneel, and crouch; (5) has visual limitations in the left eye and must avoid all exposure to hazards, including commercial driving, operating hazardous machinery, and working at unprotected heights. *Id.*

Also, the ALJ considered the State agency medical consultant at the initial level, Dr. Lewis, M.D., who opined that Plaintiff: (1) can lift and/or carry 50 pounds occasionally and 25 pounds frequently; (2) can stand and/or walk about six hours in an eight-hour workday; (3) has unlimited push and/or pull other than shown for lift and/or carry; (4) can frequently climb ramps or stairs, never climb ladders, ropes, or scaffolds, and frequently balance, stoop, kneel, crouch, and crawl; (5) has visual limitations in the left eye and must avoid all exposure to hazards, including commercial driving, operating hazardous machinery, and working at unprotected heights. *Id.* at 18. The ALJ afforded her opinion partial weight because new evidence was "presented at the reconsideration and hearing levels that demonstrated additional exertional limitations due to ongoing problems with back pain, hypertension, and diabetes mellitus type II." *Id.*

### B.    Testimonial Evidence

On October 16, 2017, the ALJ held a hearing with Plaintiff and her attorney present, and a VE present via speaker telephone. Tr. at 26-27. On examination by the ALJ, Plaintiff testified that she lives on the third floor of her apartment building, and she takes public transportation often. *Id.* at 33-34. She stated that she is single and lives with her 16 year-old son who has asthma. *Id.* at 32-33. She also testified that she has had no full-time work in the last 15 years. *Id.* at 36. When asked why she was unable to work full-time for the past couple of years, Plaintiff testified that in 2000, before she had her son, she was working through a temp agency and hurt her back on the job. *Id.* at 37. She stated that she received a small settlement for her back injury. *Id.* The ALJ pressed her about what, if anything, has kept her from working since November 2015, when she filed her application with the Social Security Administration ("SSA"). *Id.* at 37-38. She replied that nothing has really

7

kept her from working, but she cannot stand for very long. *Id.* at 38.

The ALJ asked about Plaintiff's conditions since November 2015. *Id.* When asked about her vision, Plaintiff clarified that the vision in her right eye is "pretty good," and she was going to have cataract surgery on her left eye the following day, October 17, 2017, which should restore her vision in her left eye. *Id.* at 38-40.

Plaintiff further testified that she still has some pain in her back and legs from her back injury accident from 2000. Plaintiff stated she has not had any back surgery and does not wear a splint, brace, or bandages on her back, but she has used a cane since about 2016 for when she has to walk longer distances, which would be over a mile or for walks lasting longer than 15 minutes. *Id.* at 40-43. Plaintiff also affirmed that she has high blood pressure for which she takes medication and that she has diabetes for which she only takes pills and not insulin shots. *Id.* at 43-44.

The ALJ asked her about having deep vein thrombosis or peripheral vascular disease to which Plaintiff responded that she does presently have pain in her legs "[m]ostly, all the time." *Id.* at 44-45. She stated her left leg is in worse condition and the pain is in the area of her knee and below. *Id.* at 45.

Plaintiff also testified that she is able to take care of her personal hygiene and can do household chores without help. *Id.* at 49. Plaintiff stated she can lift and carry about ten pounds and does her own grocery shopping. *Id.* at 52.

When asked if there is any kind of full-time job she feels she could have done in the last two years, Plaintiff responded no because she cannot stand up for too long and her vision prevented her from having a seated job. *Id.* at 53. However, Plaintiff stated that she can see well enough to drive and read the newspaper or print with glasses on. *Id.* at 53-54.

Plaintiff's attorney was then given the opportunity to examine Plaintiff. *Id.* at 55. Plaintiff clarified that it is painful for her to stand for longer than about five to ten minutes. *Id.* She also stated that she is sometimes forgetful about taking her medications. *Id.* at 55-56.

Following the examination of Plaintiff, the ALJ examined the VE. *Id.* at 57. The VE testified that an individual with Plaintiff's age, education, and no past relevant work experience could perform work as, for example, a wire worker, electronics worker, and assembly press operator. *Id.* at 58-59. Additionally, the VE testified that all work would be precluded if the hypothetical individual was off task more than ten percent of the time and/or were to miss two days or more monthly, including tardy arrivals and early departures. *Id.* at 59-60. Plaintiff's attorney had no questions for the VE, and the ALJ concluded the hearing. *Id.* at 60-61.

## III.    RELEVANT PORTIONS OF THE ALJ'S DECISION

On November 30, 2017, the ALJ issued a decision denying Plaintiff's claim for SSI. Tr. at 8. The ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 5, 2015, the application date. *Id.* at 13. Continuing, the ALJ found that Plaintiff had the following severe impairments: lumbar radiculopathy; back and hip pain; no vision in the left eye; hypertension; and diabetes mellitus type II with neuropathy. *Id.* The ALJ then stated that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 14.

After consideration of the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b) with the following additional limitations: frequent climbing of ramps and stairs; never climb ladders, ropes, or

scaffolds; frequent balance, stoop, kneel, crouch, and crawl; limited to monocular vision due to no vision in the left eye; no hazards, such as unprotected heights, moving mechanical parts, and operating a motor vehicle commercially. *Id.* at 15.

After making the RFC finding, the ALJ stated that Plaintiff has no past relevant work. *Id.* at 19. The ALJ then indicated that Plaintiff was a younger individual on the date the application was filed, but changed age category to closely approaching advanced age, had at least a high school education, and was able to communicate in English. *Id.* at 19-20. The ALJ determined that the transferability of job skills was not an issue because Plaintiff did not have past relevant work. *Id.* at 20. Considering Plaintiff's age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* For these reasons, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from November 5, 2015, through the date of the decision. *Id.* at 21.

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

10

4.      If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.      If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**V.      STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding

11

must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). Therefore, even if an ALJ's decision is supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)(quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007))

## VI. LAW AND ANALYSIS

### A. Whether the ALJ's rejection of Plaintiff's allegations of disabling symptoms as less than fully credible was based upon substantial evidence

Plaintiff asserts that the ALJ's assessment of Plaintiff's credibility in which he found that "the objective evidence failed to support limitations of the level and severity as [Plaintiff] alleged" is not supported by the record. ECF Dkt. #13 at 7-8; Tr. at 17-18. Rather, Plaintiff contends, the record shows that Plaintiff's allegations are supported by the record.

The undersigned notes that the proper standard of review is whether the ALJ applied the proper legal standards and whether substantial evidence supports the ALJ's credibility determination. Even if substantial evidence exists to the contrary, this Court must affirm the ALJ's decision if it is supported by substantial evidence.

In this case, the ALJ cited to the correct legal standards, referring to 20 C.F.R. § 416.929 and

12

Social Security Ruling 16-3p in evaluating Plaintiff's allegations of pain and resulting limitations. Tr. at 15. He afforded some credibility to Plaintiff's allegations and limitations by limiting her to light work with no climbing of ropes, ladders, or scaffolds, monocular vision only due to no vision in her left eye, and no exposure to hazards, such as unprotected heights, moving mechanical parts and operating motor vehicles commercially. *Id.*

Moreover, substantial evidence supports the ALJ's discounting of Plaintiff's credibility. The ALJ explained why he did not fully credit Plaintiff's allegations of disabling pain and limitations. He reasoned that the objective evidence failed to fully support her allegations, she had long gaps in treatment, her treatment plan was conservative in nature and helped improve her symptoms, her physical functioning was essentially normal, and her daily living activities were minimally impacted by her conditions. *Id.* at 17.

Plaintiff points to several of her medical records from 2015 to 2017 (Tr. at 243, 292, 302, 334-35, 353, 359, 387), which show emergency visits due to chest pain or leg cramps. ECF Dkt. #13 at 8. However, Plaintiff then posits that, "[c]learly one would not be released from an emergency room if the condition had not abated significantly." *Id.* That is correct and is what the ALJ found. While Plaintiff did go to the emergency room for such conditions, they did abate with treatment and medication at the emergency room and with medication and physical therapy upon follow up with doctors. The ALJ discussed an emergency room visit made by Plaintiff in February of 2015 for frontal headache, high blood pressure, and chest pain. Tr. at 16, citing Tr. at 242. The ALJ noted that Plaintiff had no symptoms of change in vision, slurred speech, difficulty swallowing, or extremity weakness. *Id.* The ALJ also noted that the emergency room notes indicated that Plaintiff had not had follow-up treatment or had been to see a primary care doctor for her high blood pressure since 2011.

13

*Id.* at 16, citing Tr. at 242, 253. He also cited to chest imaging that showed no active disease in the chest, an EKG that showed normal sinus rhythm and non-specific ST-T wave changes, and an echocardiogram that showed left ventricular hypertrophy but otherwise normal results with 70-75 percent ejection fraction. *Id.* at 16, citing Tr. at 245, 256, 259. The ALJ also cited to a March 2015 stress test that showed normal results. *Id.* Additionally, the ALJ cited to numerous medical records showing that Plaintiff was given conservative treatment plans, which helped improve her symptoms. *Id.* at 17, citing Tr. at 253, 272, 292, 302, 334-35, 343, 353, 359, 387.

The ALJ also noted a subsequent emergency room visit by Plaintiff two years later in 2017 for chest pain and elevated blood pressure, which abated upon her receiving medication. Tr. at 16, citing Tr. at 334, 337, 343, 353, 360. The ALJ noted that a chest x-ray showed scarring in the bases, and the EKG showed no new ST-T wave changes. *Id.*, citing Tr. at 335, 350. He indicated that the records showed that Plaintiff's treatment plan included medication for high blood pressure and diabetes type II, blood pressure monitoring, and lifestyle changes. *Id.*, citing Tr. at 334-35, 343, 359.

The ALJ further referenced Plaintiff's hip and back pain, noting that in 2015, Plaintiff was given medications and physical therapy, and showed only slight problems with daily living activities resulting from such pain. Tr. at 17, citing Tr. at 271. He also indicated that a follow up visit in August of 2015 indicated that Plaintiff reported that her back was better with medication and physical therapy, although she later reported reoccurring back pain that may have been triggered by physical therapy. *Id.* at 17, citing Tr. at 274, 276.

In addition, while the ALJ cited to some abnormal physical examination findings, such tenderness to palpation of the lumbar spine, right hip decreased range of motion, and positive back pain upon lying straight leg raise, the ALJ noted that most of the physical examinations were

14

normal, showing that Plaintiff had clear lungs, regular heart rate and rhythm, normal reflexes, no motor or sensory deficits, full extremity ranges of motion, no edema 5/5 strength, and a normal gait. Tr. at 17.

Additionally, the ALJ cited to Plaintiff's daily living activities, noting that Plaintiff lived on the third floor, managed her own hygiene and household chores, used public transportation, and walked to the grocery store. Tr. at 17-18, citing Tr. at 26-61.

Finally, the ALJ cited to and discussed the opinion evidence in the record, which supported his determination to discount Plaintiff's allegations of pain and limitations. He specifically noted the opinions of Plaintiff's treating providers, Drs. Levy and Louis. Tr. at 18. He explained that he did not afford these opinions controlling weight because neither provided specific functional limitations, except for Dr. Louis, who provided limitations only based upon Plaintiff's vision, which the ALJ adopted. *Id*. at 19.

Moreover, Plaintiff makes a general allegation that the ALJ's finding that Plaintiff's complaints of pain were less than fully credible was not a harmless error "because a disability determination is inescapable if [Plaintiff's] complaints are deemed fully credible." ECF Dkt. #13 at 1. Specifically, Plaintiff argues the ALJ should not have considered the gaps in treatment because he did not first explore the Plaintiff's reasons, and, therefore, "using this as a factor against [Plaintiff's] credibility is contrary to law, as it was incumbent upon the ALJ to clarify this issue." *Id.* at 9. For support, Plaintiff cites a SSA regulation, 20 C.F.R. §404.1530. This regulation states:

> (a) What treatment you must follow. In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work.
>
> (b) When you do not follow prescribed treatment. If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits.

15

(c) Acceptable reasons for failure to follow prescribed treatment. We will consider your physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if you have an acceptable reason for failure to follow prescribed treatment.

20 C.F.R. § 404.1530(a)-(c) (Need to follow prescribed treatment).

With regard to the ALJ's consideration of the fact that there were gaps in treatment and several years of unmanaged conditions, Defendant conceded that "[w]hile the ALJ could have provided a more detailed analysis for the reasons why Plaintiff did not seek treatment more consistently, any error is harmless given the other well-supported reasons the ALJ provided for finding that the record did not fully support Plaintiff's allegations." ECF Dkt. # 16 at 12.

The harmless error doctrine applies to reviews of decisions of administrative agencies. *See Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). On review, a court will not remand for further administrative proceedings if the agency failed to adhere to its own procedures, unless "the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Id.* (quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)) (finding harmless error where the ALJ did not make the required findings regarding the severity of plaintiff's mental impairment because it did not deprive him of a substantial procedural right nor prejudice him on the merits); *see also Wilson v. Comm'r of Soc. Sec.*, 387 F.3d 541 (6th Cir. 2004) (holding the ALJ's failure to give "good reasons" for not crediting the opinion of plaintiff's treating physician was not harmless).

The Plaintiff has not established that she was deprived of a substantial right, nor has she shown how the outcome of the decision would have been different had the ALJ not addressed the gap in treatment or otherwise investigated it further. Although the ALJ should have adhered to 20

16

C.F.R. § 404.1530 and allow Plaintiff the opportunity to offer a "good reason" for her failure to follow prescribed treatment, the undersigned recommends that the Court find this to be harmless error because, as described above, the ALJ examined the objective evidence as a whole and his finding was supported by substantial evidence.

Although Plaintiff disputes the ALJ's findings by citing to other evidence in the record, this other evidence does not negate the finding that the ALJ applied the proper legal standards concerning Plaintiff's credibility, which had substantial evidence support his determination. For these reasons, the undersigned recommends that the Court find that Plaintiff's first claim of error has no merit.

### B. RFC and VE Testimony

During the oral hearing, the ALJ asked the VE two hypothetical questions, both of which Plaintiff challenges. The ALJ's questions contained in the transcript of the oral hearing are as follows:

> **Question (by ALJ to VE)**: Okay. I'm going to ask you some hypothetical questions. For each of these, assume the individual has the same age and education as the claimant. The first is at the light level of exertion with additional restrictions, frequent climbing ramps and stairs, no climbing ropes, ladders or scaffolds, frequent balance, stoop, kneel, crouch and crawl, and no vision in the left eye, so monocular vision at this time, no hazards such as unprotected heights, moving mechanical parts, operating a motor vehicle commercially, and that's it. There's no past work to consider, but based on the hypothetical is there other work that you would identify for this hypothetical worker and, if so, could you give me examples with national numbers for each?
>
> **Answer (of VE)**: Yes. Within the limitations you've given here, some jobs that would fit as far as being appropriate within those limitations would include jobs such as a wire worker. A wire worker is a light job, it's unskilled. The DOT number for that is 728.684-022. There are 105,000 jobs nationally. Another job that would fit within these limitations would be a job such as an electronics worker. Electronics worker is a light job and it's unskilled. It's DOT number is 726.687-010 and there

17

are 60,000, that's 6-0 thousand, jobs nationally. Another job that would fit here would be a job like an assembly press operator. Assembly press operator is light, it's unskilled. The DOT number is 690.685-014 and there are 110,000 jobs nationally. These are just three examples. I could give you others, but I should point out, while my testimony is consistent with DOT, the DOT does not give job numbers. The numbers I'm using here today come from my own experience combined with data from the Department of Labor and the Bureau of the Census.

**Question**: All right. I don't think there's a need to ask a sedentary hypothetical because of the non-mechanical application of the grid rules, but I will ask a non-exertional hypothetical. None of the other conditions apply. Assume the individual's conditions require them to be off-task 20% of a regular workday exclusive of normal breaks and/or more than two days absent monthly including tardy arrivals and early departures. Would those two conditions, individually or together, preclude competitive work?

**Answer (of VE)**: Yeah, in my opinion either one of those by themselves would eliminate competitive employment unless there was some accommodations made by an employer. But, individuals off-task more than 10% of the time, I would say no jobs – yeah, he'd get – it was 10% off-task or less, I would give you the same jobs I gave you before with the same numbers. That wouldn't change that. But, more than 10% off-task, I'd say no jobs. At the same time, if an individual was absent more than two days a month, I would say no jobs, as well, you know, unless you work for a friend or relative that would be unacceptable. In fact, my opinion is, if an individual's absent more than one day a month, I'd say no jobs. One day a month absence is acceptable in most unskilled work. If that was the case, I would give you the same jobs with the same numbers that I had given you before. And I should point out that while my testimony is consistent with the DOT, the DOT does not address on-task/off-task behavior or absenteeism. My responses there come from my own experience.

Tr. at 58-60.

In this assertion of error, Plaintiff contends that the ALJ presented an inaccurate RFC and hypothetical individual to the VE. ECF Dkt. #13 at 10-11. Plaintiff asserts that the ALJ should have restricted her to sedentary work based upon her complaints of pain and resulting limitations. *Id.* at 10. Plaintiff also contends that the ALJ failed to give enough weight to the VE's testimony that there would be no jobs if the hypothetical individual were to miss more than one day of work a month or

18

be off-task more than 10% of the workday. *Id.*

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) (citing *Howard v. Comm'r Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). While the RFC should focus on a claimant's abilities, or, what the claimant can and cannot do, the hypothetical question should focus on the claimant's overall state including his or her mental and physical maladies. *Howard*, 276 F.3d at 239. If the hypothetical question posed by the ALJ is not based on an accurate RFC, then the ALJ cannot rely on the VE's response as substantial evidence to support the conclusion that a claimant can perform other work. *Ealy*, 594 F.3d at 516-17; *Howard*, 276 F.3d at 238-39. However, "[a]n ALJ is only required to incorporate into a hypothetical question those limitations he finds credible." *Lee v. Comm'r Soc. Sec.*, 529 Fed.Appx. 706, 715 (6th Cir. 2013) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)); *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

In this case, the ALJ properly discussed Plaintiff's complaints of pain and resulting limitations, as found above. Thus, to the extent that Plaintiff asserts that the complaints of disability pain restrict her to a sedentary work level, the undersigned has already recommended that the Court find that the ALJ properly discounted her credibility and limitations resulting from her pain. This leaves Plaintiff's assertion concerning her RFC and limitations based on attendance and being off-task. ECF Dkt. # 13 at 10.

On evaluating Plaintiff's attendance and off-task limitations, the ALJ considered Plaintiff's treating providers. Tr. at 18-19. He afforded the opinion of Dr. Levy less than controlling weight because he provided no opinion regarding specific functional limitations. *Id.* at 19. The ALJ also considered Plaintiff's other treating source, Dr. Louis and gave his opinion less than controlling weight as well, explaining that "Dr. Louis only indicated visual limitations of one degree DOC but no other exertional, postural, manipulative, or psychological limitations." *Id.* Additionally, the ALJ found that Dr. Louis "opined no limitations regarding interference with attention and concentration due to pain or other symptoms, work stress tolerance, and absenteeism." *Id.*

The ALJ then afforded great weight to the State agency medical consultant at the reconsideration level, Dr. Hughes, finding that his opinion was consistent with the record as a whole. *Id.* at 18. Dr. Hughes opined that Plaintiff: (1) can lift and/or carry 20 pounds occasionally and 10 pounds frequently; (2) can stand and/or walk about six hours in an eight-hour workday; (3) can sit about six hours in an eight-hour workday; (4) can frequently climb ramps or stairs, never climb ladders, ropes, or scaffolds, and frequently balance, stoop, kneel, and crouch; (5) has visual limitations in the left eye and must avoid all exposure to hazards, including commercial driving, operating hazardous machinery, and working at unprotected heights. *Id.*

The ALJ also considered the State agency medical consultant at the initial level, Dr. Lewis, who opined that Plaintiff: (1) can lift and/or carry 50 pounds occasionally and 25 pounds frequently; (2) can stand and/or walk about six hours in an eight-hour workday; (3) has unlimited push and/or pull other than shown for lift and/or carry; (4) can frequently climb ramps or stairs, never climb ladders, ropes, or scaffolds, and frequently balance, stoop, kneel, crouch, and crawl; (5) has visual limitations in the left eye and must avoid all exposure to hazards, including commercial driving,

operating hazardous machinery, and working at unprotected heights. *Id.* at 18. The ALJ afforded

her opinion partial weight because new evidence was "presented at the reconsideration and hearing

levels that demonstrated additional exertional limitations due to ongoing problems with back pain,

hypertension, and diabetes mellitus type II." *Id.*

With no evidence from treating providers to supply the absenteeism and off-task limitations

the ALJ could properly turn to the opinions of the non-treating sources and the other evidence in the

record. The ALJ did so in this case, and no evidence supported absenteeism or off-task limitations.

Plaintiff has not shown that these limitations were warranted, and, thus, she cannot show that the

ALJ erred by failing to include them in his RFC hypothetical to the VE.

Based on the objective evidence presented, the ALJ reasonably concluded that Plaintiff's

RFC was at a light exertional level.

## VII.    CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned RECOMMENDS that the Court AFFIRM the

ALJ's decision and DISMISS Plaintiff's case in its entirety with prejudice.


DATE: June 5, 2019                            ___*/s/George J. Limbert*_____
                                              GEORGE J. LIMBERT
                                              UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure
to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's
recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d
947 (6th Cir. 1981).